Our fifth argument of the morning is in appeal number 24-1192, Sean Montgomery v. C.H. Robinson Company. Okay. Is it Mr. Peteves? Good morning to you. Good morning and may it please the Court. Dimitri Peteves for the appellant, Sean Montgomery. We've raised two issues in our principal brief. I'm going to rest on the briefs for the second issue and address the first, which is whether the district court erred in granting summary judgment on the agency claim. And at the outset, I want to make one thing clear, and that's we're not arguing that a broker is always liable for agency. It's when a broker steps outside the traditional role of a broker, which is to arrange for transportation, and starts controlling the transportation. And I think here there's a genuine dispute of material fact about whether Robinson was controlling the transportation in this case. In our principal brief, we highlighted 16 different facts that demonstrated Robinson's right to control and showed that it stepped outside the normal role of a brokership. How do you get around our opinion in Kolchinsky, which is very similar? So I think Kolchinsky has some important differences, and one of them is that the carrier in Kolchinsky was responsible for determining the delivery time. So the carrier made the appointments. But here, the carrier was not even allowed to contact the recipient. Robinson was in charge of doing that, and the carrier had no power to change the delivery times. So in effect, Robinson's almost acting like a dispatcher here. It's telling the carrier when it's supposed to get there, and it has control over communications with both the shipper and the recipient. The carrier testified that often the shipper doesn't even know who it is. It doesn't get to talk to the shipper or recipient. But how does that control how the driver delivered the load, which is what's relevant here? So I don't think it has to be that narrow that it was controlling whether he turned the steering wheel left or right. It's whether they controlled the transportation. And that's shown, for example, in the Spurl case that we rely on. In that case, the broker didn't have the power to tell the driver when to change lanes or how to drive the car, but it had control. But there was evidence there that the fines that were imposed and the very tight time frames caused the driver to drive differently. It affected how she performed her work, and we don't have that here. We don't have testimony saying like that, like Your Honor pointed out, but we do have a very analogous system. We don't have specific fines, but the load confirmation that was part of the party's contract, it was an addendum to the contract, said that Robinson could reduce payment or reduce future business opportunities if the carrier failed to comply with any of the terms and conditions. So if the carrier didn't communicate with Robinson or give Robinson the information that it wanted, Robinson could reduce payment. And that's the logical equivalent of a fine. A reduction in payment is the same as making someone pay some money. Can I ask you a question about this MacroPoint app or software or whatever it is that's talked about in the briefing? You know what I'm talking about? Yes. Okay. Is there evidence in the record that C.H. Robinson used MacroPoint to actually provide instructions and or directives to Montgomery, the driver? They didn't provide instructions through MacroPoint. MacroPoint was a tracking technology. It seems like it's a GPS kind of technology or something. Yes. Like on the whereabouts of where's the trailer right now? Yes. It's not like a texting app or something like that? No. Okay. Is that in the record? The nature of MacroPoint? Yes. Yes, it's discussed in the depositions. I believe Mark Musgrave talked about it. Okay. So this was something that the driver had on his cell phone, and it allowed Robinson to know exactly where he was. You emphasize that a bit in your brief as being one factor indicative of control. That's hard for me to see that because, to my mind, all that's doing is it's letting the freight broker know the whereabouts of the trailer, probably to assess whether a delivery deadline is going to be met or to keep a customer informed or something. Right. But the question is, did Robinson require the driver to do that? And here there's evidence that Robinson did require the carrier to do that. The load confirmation sheet, which, again, was part of the party's contract. But those are – that's what the – in your view, that's what the – so Robinson also said you need a 48-foot trailer because this is a pretty good-sized load. Those – that's – those are indicia of control as opposed to if you show up with a 20-foot, 24-foot trailer, this is going to be a major problem. Yes, those are indicia of control. Under Illinois law, the provision of equipment is a factor to be considered in agency. And, in fact, in this court's Kolchinsky decision, when it was talking about Spurl, which affirmed a jury verdict for the plaintiff, it described Spurl as upholding a finding based in part because the broker told the carrier what kind of equipment to use. And that's what – Oh, but it was a lot more than that. It wasn't decided based on that particular fact. I agree, Your Honor. And every agency case is based on all of the circumstances. There's no one single fact that controls. And we're not arguing here that any of these particular facts is what decides the case. It's when you take all of them together, there's a genuine dispute of material fact for the jury to decide the issue of agency. Another factor that was important in the Spurl case, and that this court highlighted in Kolchinsky, was that the driver in that case was required to monitor the temperature of the trailer, keep it at a certain temperature. And although that wasn't a requirement in this particular load, we do have load confirmations for prior loads with the same carrier where the driver was required to do that. And the district court didn't even consider them. In a footnote in its order, it dismissed those prior load confirmations as irrelevant. But those load confirmations were not irrelevant. Under Illinois law, you consider all of the circumstances, and that includes the past behavior because that shows Robinson's right to control. Unless this court has any other questions, I'd like to reserve my time for rebuttal. Okay. Very well. Mr. Prasadi. Thank you, Your Honors. And good morning. It may please the Court. Paul Prasadi for the C.H. Robinson Appellees. Your Honors, an inference is not reasonable if it is directly contradicted by direct evidence at the summary judgment stage. That comes from this Court's opinions in Rexa and State Farm, which we cite on page 20 of our brief in the standard review section. And that is the problem with the evidence that's presented. It relies on inferences that Robinson had the right to control some manner of delivery. But the direct evidence on that point, to judge Your Honors' questions during counsel's argument, is that Robinson did not have the right to control the manner in which this load was delivered. I went back and listened to the Kolchinsky oral arguments, just as any of you asked how they get around Kolchinsky. I don't think they can. The two questions that the Court asked in Kolchinsky was, did the broker in that case control the routes taken or the hours of service, the hours driven? The answer in Kolchinsky was no, and the answer here is no. And, in fact, there's many other things that Robinson did not control or even have the right to control about the carrier's business or how the driver drove. I think counsel mentioned that a traditional carrier-broker relationship does not give rise to an agency relationship. That's correct. In fact, Kolchinsky said that courts applying Illinois law routinely or consistently find that where a company hires an independent driver to deliver a load from A to B dictates the location and the time frame, the delivery times, but does not retain the right to control, that is not an agency relationship. And that's where the criticism in the reply of our brief that when we describe how many, that this broker relationship between Robinson and Kareev and its driver was just a typical carrier-broker relationship in which Robinson did not retain the right to control the load. That is relevant because nothing about the facts of this case and the reasonable inferences that you can draw from those, that the district court did draw from those, show that Robinson had the right to control the manner of delivery. Judge Scudder, you asked about macro point. First, it did not require two-way communication or did not allow, excuse me, two-way communication. That's on document 138-4 at the deposition page 215, lines 6 through 9. Undisputed testimony, it did not allow two-way communication. I encourage the court to look at document 138-4 at page 79, which is the actual data that macro point provides. It is exactly as the court described it, as Judge Scudder, you described it. It's a ping, it's pinging where the driver is. It's a purely location. And so it didn't allow or give even Robinson the right to go into that system and contact the driver. Hey, where are you? And in fact, that document showing the pings, there's two notations. The district court noted that Robinson did not interact with macro point during the load. There's two notations from a Robinson representative, Mr. Musgrave. There's one initially when the tracking begins, and the second one doesn't come until 8.15 a.m. on December 7th. That is about 8 or 7 hours after the accident occurred. And the timeline is important because if the accident occurred at midnight and Robinson doesn't make a notation on macro point until about 8 or 7 in the morning, it's not tracking, it's not using macro point to go in and say, hey, why are you stopped at this location in Illinois for six hours or four hours? And the undisputed testimony is that the driver, after the accident, waited to call Kareev, his boss, I think until the next morning. And then his boss, Mr. Lopez, contacted Robinson. Now, Judge Scudder, you asked about the 48-foot trailer. I agree. The point of the 48-foot trailer, first there's undisputed testimony that those are customer-specified requirements, meaning C.H. Robinson's customer is telling the carrier or telling Robinson, hey, we need this. We can't fit a load in a pup trailer, in a half-size trailer. We need a 48-foot trailer. I mean, it seems to me very hard for Robinson in the way in which the briefs describe this being done where you put, it's basically like a portal or something or a bidding system where you put these prospective jobs out there that somebody that's going to accept a job, a carrier, is going to need to know what's the job entail. Well, that's exactly right. Do I need an 18-wheeler? Do I need the equivalent of a UPS truck? Is it four hours away or 24 hours away? I mean, you need some sense of that. Well, that's exactly right, Your Honor. And actually, that brings up a good point. The load board in this case was a load board where Robinson put out loads. Is that what it's called, that portal? It's called a load board. It's called a load board, right. I think that's how the testimony referred to it. And that's what really distinguishes this case among many other things from the main case that they rely on, which is Spurl. In Spurl, the carrier's driver went out and contacted Robinson directly to obtain a load. It didn't go on a passive load board. It didn't have its carrier go out and contact. The driver went out and got the load. Then, after the load was completed, Robinson directly deposited money into the driver's bank account. The goods that were being shipped in Spurl were Robinson's own goods. It wasn't a third party like we have in this case. There were two third parties here, a shipper and a receiver. Robinson was the one in the middle brokering the load. It didn't own the flower pots being shipped. The shipping location was not Robinson's facility like it was in Spurl. And I think in the reply brief, and, in fact, that's on top of, Judge St. Evie pointed out the Spurl testimony, that the requirements that Robinson imposed on the load in Spurl, the delivery times, that the driver testified that she could not complete the route without violating federal regulations on hours of service. And we have no similar testimony that the macro point application or any other quote-unquote requirement that was put on this load affected how the driver drove the load or how Carib operated. And another important note in Spurl, Your Honors, that involved C.H. Robinson, no doubt. That accident was from 2004, so 13 years before the accident. The Riley case, which also involved Robinson, the accident was 2014, so three years before the accident in this case. And Robinson and Spurl made a similar argument that Mr. Montgomery makes here, that, hey, look, these previous two other reported cases, Robinson was not found to have been the agent. And, therefore, there must support that our relationship with this carrier and this driver also supports, or also is not an agency relationship. And the court rejected that, saying there are important facts in Spurl that were simply not present in the case here. And that's what we have here. And, in fact, in noting that, the court noted that Robinson did not own the goods in those two previous cases, did not have the facility that it was being transported to, was not a Robinson facility, and that's exactly what we have here. Just because Robinson was found to have an agency relationship with other carriers or drivers in two previous cases doesn't support the idea that they have an agency relationship with this carrier and this driver here. Your Honors, unless the Court has any more questions, I appreciate the Court's time, and I ask that the judgment of the District Court be affirmed. Okay, very well, Mr. Broussardi. Thank you. Mr. Cortevez, you have some more time. Thank you. I'd like to briefly address some more facts that I think show Robinson's right to control. And one thing you heard opposing counsel talk about was hours of service. And here Robinson had the ability to call the carrier and ask about the driver's hours of service. That was something that was testified to. That's not something that a broker, someone who's arranging transportation, would necessarily need to do. But here Robinson wants to control the transportation from point A to point B, so it's asking about hours of service. Another thing Robinson did was it had a right to know about the extent and location of all of the carriers' trucks and drivers. So, again, that's not something that pertains to an individual transportation. That's showing Robinson's control over the carrier in general. Also, we have Robinson tracking performance and assigning ratings to the carrier. So this is kind of similar to the fine system. It's incentivizing the driver to behave a certain way because the carrier is receiving a rating based on their performance, whether they're on time or whether they don't do something correctly. So this wasn't a case where Robinson was just dictating the arrival time and just dictating the container that needed to be used. You had all kinds of rights to control. Another one was Robinson could basically tell the carrier to assign a different driver. How is that a traditional role of a broker, to tell a carrier that it can't use that driver for a particular load? That's demonstrating that Robinson has the right to control the carrier. And that's also a fact that wasn't present in Kolchinsky. There was no evidence, at least from the opinion, that the broker could tell the carrier to use a different driver, that the broker could look at the hours of service, or that the broker assigned performance ratings. So all of those facts are missing. And again, no case is going to be alike. The Illinois courts have said you have to consider all of the circumstances. It's fact-by-fact analysis, and the important factors can change depending on the context. And here we're asking this court to reverse because there are, at the very least, genuine disputes of material fact for the jury on the question of agency. Thank you. Mr. Pertevez, thanks to you. Mr. Brasati, again, thanks to you. We'll take the appeal under advisement.